1 standpoint that I look at this and it reminds me of some
2 of the work they did.
3     Q    So is it your recollection that they did work
4 to assist in the selling, among other things, the
5 Chateau Julien Wine Estate property?
6     A    They did work in marketing the property.
7     Q    Okay.
8     A    Inclusive of meaning the business and -- and --
9 the business, the property, and the estate.
10     Q    The real estate, to be specific, correct?
11     A    I don't think there was ever a point where it
12 was their intent to sell the real estate as an
13 independent entity.
14     They looked at it as a package.
15     Q    Okay.
16     A    To the best of my recollection, that is what
17 this document was for.
18     MR. WEEDN: Okay. I will ask the court
19 reporter to hand to Dr. Nobles a copy of a document that
20 was previously marked as Plaintiff's Exhibit 34.
21     (Exhibit 34 previously marked)
22     Q    BY MR. WEEDN: And please let me know when you
23 have had a chance to familiarize yourself with the
24 document.
25     A    Okay.

110

Case: 17-05044   Doc# 109-9   Filed: 07/29/19   Entered: 07/29/19 21:25:52   Page 1 of 14

1  A    I do.
2  Q    Is it your recollection that Aurora Capital had
3  a bank account during that time period?
4  A    I do believe so, yes.
5  Q    Okay.  More than one bank account?
6  A    I do not believe so.
7  Q    Okay.  So on -- the document reflects a deposit
8  on January 26th.
9       Do you see that?
10 A    I do.
11 Q    It's for $600,000.  Is it your understanding
12 that this was -- reflects -- reflects the fee that
13 Aurora Capital received pursuant to its agreement with
14 Chateau Julien, Inc. and Coastal Cypress Corporation
15 reflected in Exhibit 10?
16 A    This is 10, right?  It looks like 110, but I'm
17 assuming --
18      MR. SAMINI:  That's 10, yeah.
19      THE WITNESS:  10.  Yes.
20 Q    BY MR. WEEDN:  So your answer to my question is
21 yes?
22 A    I do believe that it reflects that document,
23 yes.
24 Q    Okay.  Do you know whether, is this -- is this
25 bank account still being maintained by Aurora Capital?

1     A     I do not recall.
2     Q     Do you recall whether there were any further
3  disbursement of this $600,000 from this account?
4     A     I'm sorry, do I recall what?
5     Q     Do you know whether there were any further
6  disbursements of this $600,000 from this account?
7     A     Oh, I believe it was disbursed, yes.
8     Q     To whom?
9     A     I believe to myself and Mr. Babcock and I don't
10 recall who else.
11    Q     Okay.  Do you recall the amount of those
12 disbursements?
13    A     I do not recall at this point.
14    Q     Okay.  Do you recall the timing of those
15 disbursements?
16    A     I do not.
17          MR. SAMINI:  This is 124?
18          MR. WEEDN:  Correct.
19          I will ask the court reporter to mark as
20 Exhibit 125 a document.  At the left top corner it says,
21 "Wire Transfer Order, First American Title Company," and
22 in the top right corner is number 3473.
23          (Exhibit 125 marked)
24    Q     BY MR. WEEDN:  And, Dr. Nobles, I will
25 represent to you that we acquired this document via

1    I, ALLISON RAE ADAMS, CSR No. 13743, certify:
2    that the foregoing proceedings were taken before me at
3    the time and place herein set forth; at which time the
4    witness was duly sworn; and that the transcript is a true
5    record of the testimony so given.
6
7    Witness review, correction and signature was
8    ( ) by code.                    (X) requested.
9    ( ) waived.                     ( ) not requested.
10   ( ) not handled by the deposition officer due to party
11   stipulation.
12
13        The dismantling, unsealing or unbinding of the
14   original transcript will render the reporter's
15   certificate null and void.
16        I further certify that I am not financially
17   interested in the action, and I am not a relative or
18   employee of any attorney of the parties, nor of
19   any of the parties.
20        Dated this 7th day of February, 2019.

*[signature: Allison R. Adams]*

ALLISON RAE ADAMS

```
 1                    CERTIFICATE

 2                        OF

 3           CERTIFIED SHORTHAND REPORTER

 4                    * * * *

 5

 6          I, Christina L. Magallanes, Certified Shorthand

 7   Reporter in and for the State of California, do hereby

 8   certify:

 9

10          That the foregoing witness was by me duly

11   sworn; that the deposition was then taken before me at

12   the time and place herein set forth; that the testimony

13   and proceedings were reported stenographically by me and

14   later transcribed into typewriting under my direction;

15   that the foregoing is a true record of the testimony and

16   proceedings taken at that time.

17

18          IN WITNESS WHEREOF, I have subscribed my name

19   on this date: April 8, 2019

20

21
             *Christina Lynn Magallanes*
22          _____
             Christina L. Magallanes, CSR No. 11192
23

24

25
```

176



# EXHIBIT 16

COASTAL CYPRESS CORPORATION

SERIES A PREFERRED

STOCK PURCHASE AGREEMENT

February 21, 2011

BABC00032

Δ π EXHIBIT 27
Deponent Babcock
Date 1/24/19  Rptr. MG

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| 1. | Purchase and Sale of Stock | | 1 |
| | 1.1 | Authorization and Sale of Series A Preferred Stock | 1 |
| | 1.2 | Closing | 1 |
| 2. | Representations and Warranties of the Company | | 1 |
| | 2.1 | Organization, Good Standing and Qualification | 2 |
| | 2.2 | Corporate Power | 2 |
| | 2.3 | Capital Stock | 2 |
| | 2.4 | Subsidiaries | 3 |
| | 2.5 | Authorization | 3 |
| | 2.6 | Valid Issuance of Preferred and Common Stock | 3 |
| | 2.7 | Governmental Consents | 3 |
| | 2.8 | Litigation | 4 |
| | 2.9 | Compliance with Other Instruments | 4 |
| | 2.10 | Tax Returns | 4 |
| | 2.11 | Permits | 5 |
| 3. | Representations and Warranties of the Investors | | 5 |
| | 3.1 | Authorization | 5 |
| | 3.2 | Purchase Entirely for Own Account | 5 |
| | 3.3 | Disclosure of Information | 5 |
| | 3.4 | Investment Experience | 6 |
| | 3.5 | Accredited Investor | 6 |
| | 3.6 | Restricted Securities | 6 |
| | 3.7 | Legends | 6 |
| 4. | California Commissioner of Corporations | | 6 |
| | 4.1 | Corporate Securities Law | 6 |
| 5. | Conditions of Investor's Obligations at Closing | | 7 |
| | 5.1 | Representations and Warranties | 7 |
| | 5.2 | Performance | 7 |
| | 5.3 | Qualifications | 7 |
| | 5.4 | Proceedings and Documents | 7 |
| | 5.5 | Sale of Preferred Stock to Each Investor | 7 |
| | 5.6 | Restated Articles Effective | 7 |
| | 6.1 | Representations and Warranties | 8 |
| | 6.2 | Payment of Purchase Price | 8 |
| | 6.3 | Qualifications | 8 |
| 7. | Miscellaneous | | 8 |
| | 7.1 | Survival | 8 |
| | 7.2 | Successors and Assigns | 8 |
| | 7.11 | Governing Law | 8 |
| | 7.4 | Titles and Subtitles | 8 |
| | 7.5 | Notices | 9 |
| | 7.6 | Finder's Fee | 9 |
| | 7.7 | Expenses | 9 |
| | 7.8 | Amendments and Waivers | 9 |
| | 7.9 | Severability | 910 |

| | | |
|---|---|---|
| 7.10 | Entire Agreement | 10 |
| 7.11 | Counterparts | 10 |
| 7.12 | Counsel to Aurora | 10 |
| 7.13 | Delays or Ommissions | 10 |
| 7.14 | Facsimile Transmissions | 10 |

| | |
|---|---|
| SCHEDULE A | Schedule of Investors |
| SCHEDULE B | Schedule of Exceptions |
| EXHIBIT A | Restated Articles of Incorporation |

# SERIES A PREFERRED STOCK PURCHASE AGREEMENT

THIS SERIES A PREFERRED STOCK PURCHASE AGREEMENT (this "*Agreement*") is made on the 21st day of February, 2011 by and among Coastal Cypress Corporation, a California corporation (the "*Company*"), and the investors listed on Schedule A hereto (each, an "*Investor*" and collectively, the "*Investors*").

THE PARTIES HEREBY AGREE AS FOLLOWS:

1. Purchase and Sale of Stock.

    1.1 Authorization and Sale of Series A Preferred Stock.

    (a) The Company has duly authorized the issuance and sale to the Investors of up to an aggregate of 250,000 shares of the Company's Series A Preferred Stock, no par value per share (the "*Series A Preferred Stock*"), having the rights, restrictions, privileges and preferences set forth in the Amended and Restated Articles of Incorporation in the form attached hereto as Exhibit A (the "*Restated Articles*". The Company has duly adopted and filed the Restated Articles with the Secretary of State of California.

    (b) Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to purchase at the Closing, and the Company agrees to sell and issue to each Investor at the Closing, that number of shares of the Series A Preferred Stock set forth opposite each Investor's name on Schedule A hereto for the aggregate purchase price set forth thereon. The sale of the Series A Preferred Stock to each Investor shall constitute a separate sale hereunder and the Company's agreement with each of the Investors shall be a separate agreement. Payment of the purchase price for the Series A Preferred Stock will be made by each Investor by (a) check, (b) wire transfer, or (c) cancellation of indebtedness of the Company to the Investor representing the aggregate purchase price of the Series A Preferred Stock that the Investor is acquiring.

    1.2 Closing. The closing of the separate purchases and sales of the Series A Preferred Stock shall take place at the offices of Babcock & Associates, 1101 Von Karman Avenue, Irvine, CA 92612, at 10:00 A.M. on February 4, 2011, or at such other time and place as the Company and Investors mutually agree upon orally or in writing (which time and place are designated as the "*Closing*"). At the Closing, the Company shall deliver to each Investor a certificate representing the Series A Preferred Stock that such Investor is purchasing against payment of the purchase price therefor by check, wire transfer, cancellation of indebtedness, or any combination thereof. In the event that payment by an Investor is made, in whole or in part, by cancellation of indebtedness, then such Investor shall surrender to the Company for cancellation at the Closing any evidence of such indebtedness or shall execute an instrument of cancellation in form and substance acceptable to the Company.

2. Representations and Warranties of the Company. Attached hereto as Schedule B is a Schedule of Exceptions (the "*Schedule of Exceptions*") to the representations and warranties made by the Company to the Investors herein, which Schedule of Exceptions sets forth exceptions to and modifies, amends and supplements such representations and warranties. Each exception or disclosure therein, is made for the sake of convenience as to all sections of this

1.

Agreement, even if such disclosure is specified for a single section of this Agreement, without the need for identification of specific additional sections or repetition, but only to the extent that the disclosure is reasonably apparent on its face as being applicable to such other section. Any reference to the "knowledge" of the Company or the Company is or is not "aware" in this Section 2 shall mean the actual knowledge of any of Robert Brower, Patricia Brower or Anthony Gogliucci, as well as such knowledge that any such individuals could reasonably be expected to have of a fact of other matter after reasonable investigation. For purposes of this Section 2, any reference to the term "*Company*" shall mean and include each of Coastal Cypress Corporation, a California corporation, and Chateau Julien, Inc., a California Corporation as if each representation and warranty is being separately made regarding each such entity. Subject to the exceptions, modifications and supplements contained in the Schedule of Exceptions furnished to each Investor prior to execution hereof, the Company hereby represents and warrants to each Investor as follows:

2.1 <u>Organization, Good Standing and Qualification</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California. Each Company is duly qualified to transact business and is in good standing in each jurisdiction in which such qualification is required, except where the failure to be so qualified would not have a material adverse effect on the assets, condition (financial or otherwise), prospects or business of the Company (a "*Material Adverse Effect*"). The Company has all required power and authority necessary to own and operate its property, to carry on its business as now conducted and presently proposed to be conducted and to carry out the transactions contemplated by this Agreement.

2.2 <u>Corporate Power</u>. The Company has all requisite corporate power and authority to enter into this Agreement, to sell the Series A Preferred Stock as contemplated herein and to carry out and perform its other obligations under the terms of this Agreement. Transaction.

2.3 <u>Capital Stock</u>. The authorized capital of Coastal Cypress Corporation consists, or will consist immediately prior to the Closing, of:

(a) <u>Preferred Stock</u>. One Million (1,000,000) shares of Preferred Stock, no par value per share (the "*Preferred Stock*"), 500,000 shares of which are designated Series A Preferred Stock, , none of which are issued and outstanding. The rights, restrictions, privileges and preferences of the Series A Preferred will be as stated in the Restated Articles.

(b) <u>Common Stock</u>. One Million (1,000,000) shares of common stock, no par value per share ("*Common Stock*"), of which Seven Hundred Seventy-Five Thousand (775,000) shares are issued and outstanding.

(c) The outstanding shares of Common Stock are all duly and validly authorized and issued, fully paid and nonassessable and were issued in compliance with all applicable state and federal laws concerning the issuance of securities.

(d) Except as set forth above and as may be granted pursuant to this Agreement, there are not outstanding any options, warrants, rights (including conversion or

2.

preemptive rights or rights of first refusal) or agreements for the purchase or acquisition from the Company of any shares of its capital stock. Except as may be granted by this Agreement, the Company is not a party or subject to any agreement or understanding, and, to the Company's knowledge, there is no agreement or understanding between any persons and/or entities, which affects or relates to the voting or giving of written consents with respect to any security or by a director of the Company. Except as contemplated by this Agreement, the Company has no obligation (contingent or otherwise) to (i) issue any subscription, warrant, option, convertible security or other such right or to issue or distribute to holders of any shares of its capital stock any evidences of indebtedness of the Company or (ii) purchase, redeem or otherwise acquire any shares of its capital stock of any interest therein or to pay any dividend or make any other distribution in respect thereof.

2.4 <u>Subsidiaries</u>. The Company does not presently own or control, directly or indirectly, or hold any rights to acquire, any interest in any other corporation, association or other business entity nor has the Company ever held such interest. The Company is not a participant in any joint venture, partnership or similar arrangement nor has the Company ever been a participant in any such arrangement.

2.5 <u>Authorization</u>. All corporate action on the part of the Company, its officers, directors and shareholders necessary for the authorization, execution and delivery of this Agreement, the Restated Articles and all other agreements contemplated hereby to which the Company is a party, the performance of all obligations of the Company hereunder and thereunder, the amendment and restatement of the Articles of Incorporation, and the authorization, sale and issuance (or reservation for issuance) of the Series A Preferred Stock being sold hereunder has been taken prior to the Closing. This Agreement, the Restated Articles and all other agreements contemplated hereby to which the Company is a party constitute valid and legally binding obligations of the Company, enforceable in accordance with their respective terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

2.6 <u>Valid Issuance of Preferred and Common Stock</u>. The Series A Preferred Stock that is being purchased by the Investors hereunder, when issued, sold and delivered in accordance with the terms of this Agreement for the consideration expressed herein, will be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer, other than restrictions on transfer under this Agreement and under applicable state and federal securities laws. No shareholder of the Company has any right of first refusal or any preemptive rights in connection with the issuance and sale of the Series A Preferred Stock which will not have been waived prior to the Closing.

2.7 <u>Governmental Consents</u>. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority on the part of the Company is required in connection with the consummation of the transactions contemplated by this Agreement, except for filings required pursuant to applicable federal and state securities laws and blue sky laws, which filings will be effected within the required statutory period.

BABC00037

Case: 17-05044    Doc# 109-9    Filed: 07/29/19    Entered: 07/29/19 21:25:52    Page 12 of 14

2.8 **Litigation**. There is no action, suit, arbitration, complaint, proceeding, investigation or governmental inquiry ("*Action*") pending or, to the Company's knowledge, currently threatened or reasonably likely to be asserted against the Company. There is no Action pending, or to the Company's knowledge, threatened that questions the validity of this Agreement or the right of the Company to enter into such agreement or to consummate the transactions contemplated hereby, or that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, or any change in the current equity ownership of the Company, nor is the Company aware that there is any basis for the foregoing. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened (or any basis therefore known to the Company) involving the prior employment of any of the Company's employees, their use in connection with the Company's business of any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers. The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality. The Company has not received any opinion or memorandum or legal advice from legal counsel to the effect that it is exposed, from a legal standpoint, to any liability or disadvantage which may be material to its business. There is no action, suit, proceeding or investigation by the Company currently pending or that the Company intends to initiate.

2.9 **Compliance with Other Instruments**. The Company is not in violation of or default under any provision of its Restated Articles or bylaws or of any instrument, judgment, order, writ, decree or contract to which it is a party or by which it or its properties is subject to or bound, or of any provision of any federal or state statute, rule or regulation applicable to the Company, except where such violation or default has not had, and could not reasonably be expected to have, a Material Adverse Effect. The execution, delivery and performance of this Agreement and all other agreements contemplated hereby and thereby to which the Company is a party and the consummation of the transactions contemplated hereby and thereby will not result in any such violation, or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, order, writ, decree or contract or an event that results in the creation of any lien, charge or encumbrance upon any properties or assets of the Company or the suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties.

2.10 **Tax Returns**. Except as set forth on the Schedule of Exceptions, (a) the Company has timely filed all tax returns (federal, state and local) required to be filed by it and all Taxes (as defined below), assessments and other government charges imposed upon the Company, or upon any of the assets, income or franchises of the Company, have been timely paid or, if not yet payable, are adequately accrued on the Company's books and records; (b) there are no actual or proposed Tax deficiencies, assessments or adjustments with respect to the Company or any assets or operations of the Company; (c) no consent has been given with respect to the Company to extend the time in which any Tax may be assessed or collected by any taxing authority; and (d) there are no ongoing or pending Tax audits by any taxing authority against the Company. All filed returns are true and correct in all material respects and all Taxes shown thereon to be due have been timely paid with exceptions not material to the Company. No controversy with respect to Taxes of any type paid or payable by the Company is pending or, to the best of the Company's knowledge, threatened. The Company has not made any elections

pursuant to the Code (other than elections that relate solely to methods of accounting, depreciation or amortization) that would have a Material Adverse Effect. The Company has made adequate provisions on its books of account for all Taxes, assessments and governmental charges with respect to its business, properties and operations for such period. The Company has withheld or collected from each payment made to each of its employees the amount of all Taxes required to be withheld or collected therefrom, and has paid the same to the proper tax receiving officers or authorized depositaries. "*Tax*" or "*Taxes*" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall, profits, environmental, customs, capital stock, franchise, employees' income withholding, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, value added, alternative or add-on minimum or other similar tax, governmental fee, governmental assessment or governmental charge of any kind whatsoever, including any interest, penalties or additions to Tax or additional amounts with respect to the foregoing.

    2.11    *Permits*. The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business (except where the failure to obtain such franchise, permit, or license would not have a Material Adverse Effect), and the Company believes it can obtain, without undue burden or expense, any similar authority for the conduct of business as planned to be conducted. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

    3.    *Representations and Warranties of the Investors*. Each Investor hereby represents, warrants and covenants, severally and not jointly, that:

    3.1    *Authorization*. Such Investor has full power and authority to enter into this Agreement and all other agreements contemplated hereby to which such Investor is a party, and each such agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

    3.2    *Purchase Entirely for Own Account*. This Agreement is made with such Investor in reliance upon such Investor's representation to the Company, which by such Investor's execution of this Agreement such Investor hereby confirms, that the Series A Preferred Stock to be received by such Investor (the "*Securities*") will be acquired for investment for such Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Investor has no present intention of selling, granting any participation in or otherwise distributing the same. By executing this Agreement, such Investor further represents that such Investor does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Securities.

    3.3    *Disclosure of Information*. Such Investor represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Series A Preferred Stock and the business, properties, prospects

5

BABC00039

Case: 17-05044    Doc# 109-9    Filed: 07/29/19    Entered: 07/29/19 21:25:52    Page 14 of 14