22.   All results of the optical examinations obtained are shown in Attachment "**D**" and discussed in section "Discussion of Results from Forensic Testing" that follows.

**(ii)   Chemical Examinations**

23.   Writing inks are made of colorants (dyes, pigments) and a carrier (vehicle). Ballpoint ink vehicles consist of two main ingredients – solvents, which are used to dissolve or disperse the colorants, and resins, which are used to thicken the inks. Additionally, most writing inks typically contain multiple minor ingredients, such as modifiers, lubricants, thickeners, antiseptics, surfactants, by-products, *etc.*

24.   Toner is used in an electrophotographic engine to form an image on the specified substrate. There are many components that make up toner, such as organic polymer resins, pigments (*e.g.*, carbon black used in black toners) and dyes, waxes, flow agents, charge agents, and other additives. These components affect toner transfer and color, effectively influencing the consistency of color. Organic polymer resins allow the toner to form a plastic solid after fusing and provide consistency. The pigments and dyes carry the color of the toner. Most of these components can be chemically analyzed for comparing toner samples.

25.   Paper consists of numerous components and typically includes a fluorescent whitening agent(s), or FWA. FWAs are expensive chemical additives mixed with pulp in the paper to make paper look "whiter." Typical FWA absorbs UV light between 300 and 380 nm and re-emits light in the visible spectrum, usually in the 400-470 nm range, which is blue light. (Subjectively, something that appears bluer is regarded as being "whiter").

26.   Thus, ink, toner and paper are mixtures of numerous chemical compounds that can be analyzed using specialized analytical techniques. In this case, I used two widely accepted analytical techniques to analyze the materials of a document. The first is thin-layer chromatography (TLC), which primarily analyzes ink and toner colorants (colored components) and FWAs in paper, and the second is gas chromatography-mass spectrometry (GC-MS), which primarily analyzes volatile and semi-volatile components of ink, toner, and

paper (solvents, resins, and other noncolored components, such as modifiers, lubricants, thickeners, antiseptics, surfactants, by-products, *etc.*)

27.    Prior to the chemical analysis of the ink, toner and paper, I took samples of these materials using specialized devices[7] and then placed the samples in vials, sealed them with screw top caps, and labeled them.

### *Thin-Layer Chromatography (TLC)*

28.    TLC is a widely used and scientifically accepted method used to characterize multi-component materials. TLC allows a forensic scientist to separate out different components of a material, such as ink, toner or paper. Once these components are separated, they can be analyzed and compared with the components of other similar materials. Some toners and most inks are typically composed of multiple colorants (pigments, dyes) that can be separated and analyzed by TLC. In order, for example, to perform TLC on ink (toner, paper), the ink is extracted from the ink-on-paper samples using an appropriate extracting solvent. The ink extract is then applied, as a small spot, onto a glass plate pre-coated with a white chalk-like thin layer of silica gel. The TLC plate is then developed with a mixture of solvents. As the plate develops, the solvent mixture diffuses up the plate by capillary action and carries the ink's components upwards. Different colorant components of the ink will typically move at different rates along the TLC plate due to their physical and chemical differences, and stop migrating at different points. Once the TLC plate is fully developed, the separated dye components will appear on the plate as a combination of colored spots. The combination of the separated dye (and other) components of the ink is called a TLC chromatogram. The obtained TLC chromatogram can then be compared with the TLC chromatograms of other ink samples (*e.g.*, those taken from an ink library) to determine if they match.

29.    TLC also helps a forensic examiner to identify a writing ink and then determine whether the ink was or was not commercially available on the purported date of

---

[7] Hypodermic needle-like apparatuses, the Harris Micro-Punch™ (Electron Microscopy Sciences, Hatfield, PA), which remove *ca.* 0.5-mm and 1.0-mm samples (micro plugs) of paper and ink/toner on paper. The bored out paper, toner and ink samples are removed with a plunger.

---

the writing. Since manufacturers are known to change old inks or introduce new ink formulations, it may be determined that an ink formulation was not in production on the purported date of the document. If the pattern of colorants in a questioned ink matches the pattern of colorants in the ink of a particular manufacturer in a reference library of inks, then the questioned ink can be said to come from that manufacturer, and the introductory date may be determined.

30.   *TLC Analysis Procedure* – Each of the toner, ink and paper blank samples taken from each examined document was placed into a small glass vial and extracted with about 2 microliters of dimethylformamide for *ca.* 20 minutes. The obtained extract was applied using a capillary pipette on a high performance TLC silica gel 60-$F_{254}$ (10 x 10 cm) pre-coated glass plate (Merck, Germany). The TLC plate was allowed to air dry (a hair dryer was used too) and was then placed in a vertical orientation into a developing tank. The tank was a glass enclosure with a removable lid and contained a few milliliters of a developing solution (mobile phase). The plate was developed sequentially using two mobile phases: 1) acetone – hexane = 1:4, and 2) ethyl acetate – isopropanol – water – acetic acid = 30:15:10:1. Resulting chromatograms obtained for each sample tested were observed and photographed (see, for example, Figures 3 and 4 below).



**Figure 3.** The thin-layer chromatogram (photographed under daylight) obtained for paper blank samples (lanes number I-III) and ink samples (lanes IV-VII) taken from the "Happy Anniversary" card, designated as the "11/8/00 Note from Bob to Patty" (see Attachment "C"): the initial text "*Dearest Patty Love forever ^B^*" was written with a blue ballpoint ink (lanes IV and V) that has a different chemical composition as compared with the blue ballpoint ink used to write the other two entries on the card – "*11/8/00*" (lane VI) and "*ACP is now yours*" (lane VII).



**Figure 4.** The thin-layer chromatogram (photographed under daylight) obtained for twenty two (22) ink samples taken from the "Patricia Brower" signatures on the 22 "Waivers" (Waiver of Notice and Consent to the Holding of a Board of Directors and Shareholders Meeting of American Commercial Properties, Inc. A Nevada Corporation), dated from April 15, 1994 to April 22, 2015.

31.  All TLC data obtained are shown in Attachment "**D**" and discussed in section "Discussion of Results from Forensic Testing" that follows.

### Gas Chromatography-Mass Spectrometry (GC-MS)

32.  GC-MS is routinely used for chemical analysis in forensic laboratories throughout the world and is a method that can be used to separate and identify specific components (substances) in a sample. GC-MS has a variety of forensic applications, including: drug detection, fire investigation, environmental analysis, explosives investigation, and the identification of unknown samples. With respect to ink analysis, GC-MS is typically used to compare the non-colorant ingredients in inks, such as resins, volatile, and semi-volatile components.

33.  The procedure of the GC-MS analysis involves vaporizing a sample (in a heated injection port) and sweeping it through a column with a moving stream of gas termed the mobile phase or the carrier gas. Compressed gas cylinders commonly supply the gases. The sample is introduced into the injection port. The most common type of analysis involves the

Aginsky Forensic Document Dating Laboratory, Inc.    Tel.: (517) 339-0593    http://www.documentdating.com

injection of approximately 1 microliter of a liquid sample into a heated injection port, which is interfaced to the capillary column where the actual separation takes place. The capillary column's inner walls are coated with a viscous liquid material (it is called the stationary phase). This inner coating will interact with different molecules to different extents. Those components of the mixture, which weakly interact with the stationary phase, pass more quickly through the column than those compounds, which have stronger interactions with the stationary phase. For this reason, different components of the mixture exit the column at different times. As each component of the mixture comes off the column, it is detected by the MS detector. The detector sends a signal to the attached computer, which displays each signal as a peak on a chart. The array of peaks (one peak for each component) is called a GC-MS chromatogram. A GC-MS chromatogram obtained for a certain material can be considered as a "chemical fingerprint" of the vehicle components of this material. When GC-MS is used for comparing, say, ten entries written with similarly colored inks, the chromatograms are recorded for each of the ten inks, and then these "chemical fingerprints" are compared to determine the number of different inks (different formulations and/or batches) used to produce the entries.

34.  *GC-MS Analysis Procedure* – Each of the ink samples taken from each examined document was placed into a small glass vial,[8] and extracted with *ca.* 2 microliters of chloroform for *ca.* 15 minutes. Each extract obtained was analyzed using an Agilent 6850 gas chromatograph equipped with a split/splitless injection system and interfaced with an Agilent 5975C mass selective detector.

35.  The GC conditions and MS parameters were as follows:

Column: DB-5MS, 30 m x 0.25 mm ID x 0.25-micrometer film thickness (cross-linked 5%-phenyl-95%-dimethylpolysiloxane)
Liner: splitless, single-taper, deactivated glass wool
Carrier: Helium (column flow 1 mL/min)
Oven program: Isothermal for 1.2 min at 36°C, program 15°C/min to 270°C and hold for 15 min
Injection: *ca.* 1 microliter, pulsed splitless, T=260°C
Pressure pulse: 120 kPa until 1.2 min
Purge flow to split vent: 30 ml/min at 1.2 min
GC/MS transfer line: 280°C

---

[8] All the vials used for the GC-MS analyses were Grace 2-mL capped, screw thread, standard mouth clear vials containing Alltech 100-microliter glass inserts with self-centering polyethylene springs.

Aginsky Forensic Document Dating Laboratory, Inc.   Tel.: (517) 339-0593   http://www.documentdating.com

Tune: autotune
Scan range: 45 - 450 atomic mass units (amu)



**Figure 5.** The GC-MS chromatogram of the ink of the "Robert Brower" signature on the "Waiver" dated April 17, 2000. The 17 peaks marked with asterisks represent the components of the ink. The other peaks on the GC-MS chromatogram represent the components extracted from the paper of the document.

36. All GC-MS data obtained are shown in Attachment "**D**" and discussed in section "Discussion of Results from Forensic Testing" that follows.

### (iii) Ink Dating Tests – The "Static" and "Dynamic" Approaches

37. There are two approaches to chemically determine the age of inks on documents. One determines and compares the "*static*" (compositional) characteristics of the relevant inks with those of a collection of inks, each having a known production date; the other determines the "*dynamic*" (aging) characteristics of inks. Comprehensive reviews of ink-dating methods based on the static and dynamic approaches have been published by Dr. Antonio Cantu.[9]

### *The "Static" Ink-Dating Approach – Ink Availability and Ink Comparison Tests*

38. The "**static**" approach deals with inks' analytical profiles that do not change with age.

39. **Ink Availability** – The Ink Availability Test is used to analyze the chemical composition of inks on a contested document with the aim to determine whether these inks were commercially available on or prior to the date appearing on the document. For example, if the questioned document's date precedes the manufacturing date for the ink used to sign the document, it is established that the document could not have been signed on the date it bears.

40. The Ink Availability Test is described in the SWGDOC Standard for Writing Ink Identification (see Attachment "**E**").

41. **Ink Comparison** – The Ink Comparison Test is used to analyze and compare

---

[9] Cantu, A.A. (1995). "A Sketch of Analytical Methods for Document Dating. Part I. The Static Approach: Determining Age Independent Analytical Profiles." *International Journal of Forensic Document Examiners*. Vol. 1, No. 1, pp. 40-51; Cantu, A.A. (1996). "A Sketch of Analytical Methods for Document Dating. Part II. The Dynamic Approach: Determining Age Dependent Analytical Profiles." *International Journal of Forensic Document Examiners*, Vol. 2, No. 3, pp. 192-208.

the chemical compositions of the inks of various handwritten entries dated over a period of time to determine whether the use of ink formulas fits a patters that is consistent with *A)* the entries being written on their respective (purported) dates or *B)* the entries being written contemporaneously – within a short period of time.

42.   The Ink Comparison Test, and specifically the application of the *ink dating (based on ink comparison) approach* is outlined in Sections 4.1 and 4.5 in the SWGDOC Standard for Test Methods for Forensic Writing Ink Comparison (see Attachment "**F**"):

> "4.1  Ink comparisons are usually performed to answer four basic categories of question:  (1) *whether an ink is the same (in formula) as that on other parts of the same document or on other documents*;  (2) *whether two writings with similar ink have a common origin, that is, the same writing instrument* or ink well;  **(3) *whether the ink of entries dated over a period of time is consistent with that dating or indicates preparation at one time*;**  (4) whether ink is as old as it purports to be […]
>
> 4.5 […] ***regarding question three, it may be of great importance in a forensic situation involving writing dated over a period of time to determine that one or more than one ink formula is present, that the use of various ink formulas fits a pattern***, that a particular ink formula matches samples of a known date, etc."
> [Emphases added in italic and in bold italic]

### *The "Dynamic" Ink-Dating Methods – Ink Aging Approaches*

43.   The "**dynamic**" approach measures the characteristics of an *aging* ink that change with time. In the framework of this approach, the following two ink aging sub-approaches are currently used in casework in various countries:

- **Ink Aging Approach 1** – *Sequential (Solvent) Extraction Technique* that measures the rate of aging (thickening, hardening, setting) of the resin, a component of ballpoint ink; and

- **Ink Aging Approach 2** – Ink aging methods that measure <u>the gradual loss with time of the solvents</u> contained in ink on paper.

---

Aginsky Forensic Document Dating Laboratory, Inc.   Tel.: (517) 339-0593    http://www.documentdating.com

***Ink Aging Approach 1** – The Sequential (Solvent) Extraction Technique ("SET")*

44.     The methodological basis (theoretical and practical aspects) for the SET was developed by Dr. Cantu in the 1980s. According to the SET's *underlying theory* (generally accepted by the scientific community of forensic chemists and ink-dating specialists), the extent to which a ballpoint ink can be extracted by a so-called "weak" solvent decreases in a monotonic manner as the ink ages on paper.

45.     The SET that analyzes ink volatile components, determines the rate, $D\%$, at which the resin, a component of ballpoint ink, is aging (*i.e.* thickening, hardening, setting) at the time when the ink is being examined.[10] This method has proven reliability in outside proficiency testing using "blind" samples of ballpoint ink entries of different ages (outside proficiency tests in 1995, 2001, and 2011).

46.     As a ballpoint ink ages on a document, the value of $D\%$ gradually decreases down to zero during a certain period of time, which mainly depends on the ink composition and the storage conditions. Under normal environmental conditions (*ca.* 22°C plus/minus 8°C), this period of time can be as short as approximately 6 months, for *fast* aging ballpoint inks, and as long as approximately 2 years, for *slow* aging ballpoint inks.

***Ink Aging Approach 2** – A group of ink aging methods, including the Solvent Loss Ratio Method ("SLRM"), that measure gradual disappearance of ink volatile components from ink on paper*

47.     **SLRM** – This ink aging method determines the rate, $R\%$, at which the volatile component content of ink decreases at the time when the ink is being examined. This

---

[10] Aginsky, V.N. "Dating and Characterizing Writing, Stamp Pad and Jet Printer Inks by Gas Chromatography/Mass Spectrometry." *International J. Forensic Document Examiners*, 1996, Vol. 2, No. 2, pp.103-115. Aginsky, V.N. *"Current Methods for Dating Ink on Documents."* Proceedings of the 60th Annual Conference of the American Society of Questioned Document Examiners, San Diego, California, August 14-19, 2002. Aginsky, V.N. *"Ink-Dating – The Essentials of the Sequential Extraction Technique."* Proceedings of the 7th International Congress of Experts in Forensic Document Analysis (SIPDO 2012), Las Palmas de Gran Canaria, Canary Islands, October 23-26, 2012. Aginsky, V.N. (2014). "Ink Aging Testing – Do Preceding Indentation Examinations Affect Ink Aging Parameters?" *Journal of the American Society of Questioned Document Examiners*, Vol. 17, No. 2, pp. 49-63.

method (first reported as *Rate of decrease of volatile components R%* in my 1996 article "*Dating and Characterizing Writing, Stamp Pad and Jet Printer Inks by Gas Chromatography/Mass Spectrometry*" and then further described in two papers in 2002 and 2010[11]) is routinely used by the Forensic Sciences Division of the Canada Border Services Agency (former Canada Customs and Revenue Agency, Ottawa, Ontario, Canada) for determining the approximate age of ballpoint ink on paper.

48. The "dynamic" ink-dating methods (ink aging approaches) were not used in this examination *1)* because both entries of questionable age located on the "Happy Anniversary" card, designated as the "11/8/00 Note from Bob to Patty" (the entries "*11/8/00*" and "*ACP is now yours*"), had been affected by the glue of the scotch tape affixed to the paper in the areas that bear these entries, and *2)* because the results of the "static" ink-dating tests (both ink availability and ink comparison tests) had provided sufficient evidence regarding the actual "age" of the majority of the submitted "Minutes" (Minutes of the Meeting of the Shareholders and Directors of American Commercial Properties, Inc.) and "Waivers" (Waiver of Notice and Consent to the Holding of a Board of Directors and Shareholders Meeting of American Commercial Properties, Inc. A Nevada Corporation).

49. The results of the "static" ink-dating tests (ink availability and ink comparison tests) are discussed in the section "Discussion of Results from Forensic Testing" below.

E. **DISCUSSION OF RESULTS FROM FORENSIC TESTING**

50. Except for two documents,[12] all the other documents dated from April 15, 1994 to April 22, 2015 – 44 pages comprising the "Minutes" (Minutes of the Meeting of the Shareholders and Directors of American Commercial Properties, Inc.) and 22 pages

---

[11] Aginsky, V.N. "Dating and Characterizing Writing, Stamp Pad and Jet Printer Inks by Gas Chromatography/Mass Spectrometry." *International J. Forensic Document Examiners*, 1996, Vol. 2, No. 2, pp.103-115. Marc Gaudreau and Luc Brazeau, "*Ink-Dating Using A Solvent Loss Ratio Method.*" Proceedings of the 60th Annual Conference of the American Society of Questioned Document Examiners, San Diego, California, August 14-19, 2002. Gaudreau, M. and Aginsky, V.N. "*Essentials of the Solvent Loss Ratio Method.*" Proceedings of the 68th Annual Meeting of the American Society of Questioned Document Examiners, Victoria, B.C., August 28 - September 2, 2010.

[12] The "Minutes" and "Waiver" both dated November 20, 2000. The machine printed texts on these documents were created with a laser printer(s) or photocopier(s) utilizing black toner.

comprising the "Waivers" (Waiver of Notice and Consent to the Holding of a Board of Directors and Shareholders Meeting of American Commercial Properties, Inc. A Nevada Corporation), have been produced on white letter size copy paper (without watermark) with an office machine system (laser printer, photocopier) that uses dry toner-based electrophotographic technology and four-color (CMYK[13]) toner.

51. No significant differences were found between any of the pages of the above "Minutes" and "Waivers" (66 pages in total) when assessing and comparing page format (alignment, spacing), "trash" marks, print quality, and toner morphology (at magnifications 40x and 140x) from page to page.

52. The physical and optical examinations showed that the paper of all the 66 pages of the "Minutes" and "Waivers" shows matching physical characteristics, such as color, thickness, short- and long wave UV fluorescence, infrared luminescence, surface texture, and opacity.[14]

53. The results of the chemical (TLC) analysis of the paper of the "Waivers" (22 pages) showed that the paper of all the 22 pages contains the same optical brightener (FWA) consisting of three (3) fluorescent components.

54. The results of the physical (optical) examinations showed that the "Minutes" and "Waivers" have been printed using a physically indistinguishable color (CMYK) toner.

55. The chemical (TLC) examinations of the color toner samples taken from the "Waivers" detected the presence of the same (chemically indistinguishable) blue (Cyan), red (Magenta), and yellow components (colorants) of the CMYK toner.

56. Summing it up, the above "Minutes" and "Waivers" (66 pages in total) were printed with matching (indistinguishable between the documents) print quality, on the matching (physically and chemically indistinguishable) sheets of white copy paper, using a physically and chemically indistinguishable color toner, and probably on the same machine (printer/copier). It is unlikely that documents purportedly printed annually over a period of time of 21 years – from 1994 to 2015 – could have been printed using chemically

---

[13] The four capital letters, CMYK, stand for cyan, magenta, yellow, and black, respectively, and are the four colors used in most four-color printing technologies.

[14] The opacity of paper refers to the extent to which light transmits through the paper. Different types of paper may have varying ingredients that cause light to transmit differently.

indistinguishable paper and toner with the matching (indistinguishable from document to document) print quality.

57.   The results of the physical (optical) and chemical (TLC, GC-MS) examinations show that all signatures in the names of Robert Brower and Patricia Brower on the above 22 "Waivers", dated from April 15, 1994 to April 22, 2015, were written with the black ballpoint inks of at least two formulations (used in Bic and Zebra ballpoint pens).

58.   Besides, the results of the optical (see Figures 1 and 2 above, as well as other photomicrographs in Attachment "**D**") and chemical (TLC, GC-MS) examinations provide evidence that the same Zebra ballpoint pen was used *A)* by Robert Brower to sign four "Waivers" dated April 17, 1995, April 15, 1999, April 17, 2000 (see Figure 5 above), and April 15, 2004, and *B)* by Patricia Brower to sign six "Waivers" dated April 15, 1996, April 17, 2000, April 15, 2002, April 17, 2006, April 13, 2010, and April 12, 2011 (see Figure 4 above; lanes 3, 7, 9, 13, 17, and 18). It is unlikely that the same pen could have been used over a period of time of 16 years – from April 17, 1995 to April 12, 2011.

59.   The Zebra ink mentioned in the above paragraph is a black ballpoint ink formulation, which has been manufactured by Zebra Co. Ltd. (Japan) since 2003 and used in Zebra Z-grip ballpoint pens.

60.   As the ink of the "Robert Brower" signatures on three "Waivers" dated April 17, 1995, April 15, 1999, and April 17, 2000, and the ink of the "Patricia Brower" signatures on three "Waivers" dated April 15, 1996, April 17, 2000, and April 15, 2002, were not commercially available until 2003, therefore the above six (6) "Waivers" are not authentic with respect to their purported dates.

61.   The results of the optical and chemical (TLC) examinations show that the text on the "Happy Anniversary" card, designated as the "11/8/00 Note from Bob to Patty" (see Attachment "C"), was written using two pens (inks): the initial text *"Dearest Patty Love forever ^B^"* was written with a blue ballpoint pen that is different (contains a different ink) from the blue ballpoint pen used to produce another two entries on the card – *"11/8/00"* and *"ACP is now yours"* (see Figure 3 above). These examination results strongly support the proposition that the entries *"11/8/00"* and *"ACP is now yours"* were not written

contemporaneously with the initial text, and instead these entries were added to the card some time after the initial text had been written.

## F. CONCLUSIONS

62.     Based on my professional experience, scientific knowledge, and training, and my analysis and testing of the submitted documents, as described above, I hold the following opinions:

*A)*    It is highly probable[15] that the above "Waivers" (Waiver of Notice and Consent to the Holding of a Board of Directors and Shareholders Meeting of American Commercial Properties, Inc. A Nevada Corporation; 22 pages) and "Minutes" (Minutes of the Meeting of the Shareholders and Directors of American Commercial Properties, Inc.; 44 pages), dated from April 15, 1994 to April 22, 2015, were produced and signed contemporaneously – within a short period of time, not during the purported timeframe of up to 21 years – from April 15, 1994 to April 22, 2015.

*B)*    The entries on the "Happy Anniversary" card, designated as the "11/8/00 Note from Bob to Patty" (see Attachment "**C**"), were written using two pens (inks): the initial text *"Dearest Patty Love forever ^B^"* was written with a blue ballpoint pen that is different (contains a different ink) from a blue ballpoint pen used to produce another two entries on the card – *"11/8/00"* and *"ACP is now yours."* It is highly probable[16] that the entries *"11/8/00"* and *"ACP is now yours"* were added to the card some time after the initial text had been written.

---

[15] According to the *SWGDOC "Standard Terminology for Expressing Conclusions of Forensic Document Examiners,"* the term "highly probable" describes an opinion when there is *very strong (clear and convincing) evidence* to support the conclusion.

[16] Ibid.

Aginsky Forensic Document Dating Laboratory, Inc.   Tel.: (517) 339-0593   http://www.documentdating.com

## DISPOSITION OF EVIDENCE

63. The examined documents were sent back to Defendants' counsel, David Balch, L+G, LLP, 318 Cayuga St., Salinas, CA 93901 via FedEx Priority Overnight (tracking number 8758 8447 1914) on February 5, 2019.

## DEMONSTRATIVES

64. During the course of my examination and testing, I observed, reviewed and recorded numerous photographs and digital files. I reserve the right to rely on visual aids or demonstratives not present in this report to demonstrate my opinions at trial. Also, I reserve the right to supplement this report should further documents become available for examination.

Valery N. Aginsky, Ph.D.
Forensic Chemist & Document Dating Specialist

Attachment "A" – My Curriculum Vitae (incl. List of publications and list of cases)

Attachment "B" – Photographs (color images) and pdf copies of the submitted documents

Attachment "C" – The "Happy Anniversary" card designated as the "11/8/00 Note from Bob to Patty"

Attachment "D" – Examination Data Obtained (photographs, scans, microscopic images, digital files, chromatograms, worksheets, etc.)

Attachment "E" – SWGDOC Standard for Writing Ink Identification

Attachment "F" – SWGDOC Standard for Test Methods for Forensic Writing Ink Comparison

# EXHIBIT 29

# DECLARATION OF TRUST

## BY

## PATRICIA A. BROWER

## OF THE

## BROWER TRUST (2015)
Established by Declaration of Trust dated ___June 30th___, 2015

ACP / Patty Brower  0020

Case: 17-05044    Doc# 109-13    Filed: 07/29/19    Entered: 07/29/19 21:25:52    Page 17 of 20

UB0012551

| | | | Page |
|---|---|---|---|
| VI. | DEBTS | | 7 |
| | A. | Debts of Settlor and Estate | 7 |
| | | 1. Funeral and Last Illness Expenses | 7 |
| | | 2. Other Debts | 7 |
| | | 3. Probate Expenses | 7 |
| | B. | Limitation on Sources of Payment | 7 |
| VII. | OFFICE OF TRUSTEE | | 7 |
| | A. | Definition of Trustee and Successor Trustee | 7 |
| | B. | Scope of Trustee Provisions | 7 |
| | C. | Resignation of Trustee | 8 |
| | D. | Removal of Any Trustee | 8 |
| | E. | Power to Name Successor Trustee | 8 |
| | F. | Temporary Trustee | 8 |
| | G. | Trustee's Power to Delegate | 8 |
| | H. | Applicable Rules for Co-trustees | 8 |
| | | 1. Lack of Unanimity | 9 |
| | | 2. Vacancy | 9 |
| | | 3. Disqualified Trustees | 9 |
| | | 4. Temporary Disability | 9 |
| | | 5. Delegation of Authority | 9 |
| | I. | Compensation of Trustees | 9 |
| VIII. | TRUSTEE POWERS | | 9 |
| | A. | General Powers of Trustee | 9 |
| | | 1. California Law | 9 |
| | | 2. Prudent Person | 9 |
| | | 3. Prudent Investor | 10 |
| | | 4. Owner of Property | 10 |
| | | 5. Other Powers | 10 |
| | | 6. Uniform Trust Code | 10 |
| | B. | Specific Powers of Trustee | 10 |
| IX. | TRUSTEE DUTIES, LIMITATION ON DUTIES, EXCULPATION | | 11 |
| | A. | Duties of Trustee | 11 |
| | B. | Limitations on Trust's Duty of Loyalty | 11 |
| | C. | Acceptance of Additions | 11 |
| | D. | Exculpation of Trustee | 11 |
| | E. | Co-trustee's Duty to Act | 12 |
| | F. | Limitation on Duty to Investigate Predecessor of Co-trustee | 12 |
| | G. | Accounting | 12 |
| | H. | Bond | 12 |

# DECLARATION OF TRUST

## BY

## PATRICIA A. BROWER

## OF THE

## BROWER TRUST (2015)
Established by Declaration of Trust dated June 30th, 2015

PATRICIA A. BROWER (referred to in this instrument as the "Settlor"), declares that she has transferred and delivered to herself, as trustee, in trust, without consideration, the property described in Schedule A attached to this instrument.

The trust created by this instrument may be referred to as the "BROWER TRUST (2015)" and the assets of this trust may be titled as "Patricia A. Brower, Trustee of the BROWER TRUST (2015) UDT dated June 30th, 2015."

## I.

## FAMILY DECLARATIONS

Settlor is married to ROBERT S. BROWER, SR., who was previously married. Settlor is a citizen of the United States and a resident of Carmel, California.

Settlor has one (1) child of her marriage to Robert S. Brower, Sr., namely her son, ROBERT S. BROWER, JR., who is an adult. Robert S. Brower, Sr. has two (2) children from a previous marriage, namely his daughters, DAWN M. RESH and AMY I. SANTUCCI, both of whom are adults.

## II.

## TRUST ESTATE

All property subject to this trust at any time is sometimes referred to as the "trust estate" and will be held, administered, and distributed as provided below.

A. <u>Settlor's Separate Property</u>. Settlor owns certain property described on Schedule A, all of which is Settlor's separate property, and which is referred to herein as "Settlor's Separate Property." Settlor hereby conveys and transfers to the trustee as additional Settlor's separate property any and all property or property interests acquired by Settlor at any time, including from and after the date hereof, by gift, bequest, devise or descent. Settlor intends

1

ACP / Patty Brower 0022

Case: 17-05044    Doc# 109-13    Filed: 07/29/19    Entered: 07/29/19 21:25:52    Page 19 of 20

UB0012553

2. <u>Distribution of Residue</u>. Upon the death of the Settlor, the trust estate shall be distributed to ROBERT S. BROWER, JR., if he survives the Settlor, and if not, then to the issue of ROBERT S. BROWER, JR., by right of representation.

If ROBERT S. BROWER, JR. predeceases the Settlor without surviving issue, the gift to him shall lapse and then the trust estate shall be divided into two (2) equal shares and distributed to DAWN M. RESH and AMY I. SANTUCCI, by right of representation.

Should either DAWN M. RESH or AMY I. SANTUCCI predecease the Settlor without surviving issue, then the gift to such predeceased beneficiary shall lapse and be added to the share of the other. If both DAWN M. RESH and AMY I. SANTUCCI predecease the Settlor without issue, then the trust shall be distributed as provided in Paragraph D. of Article IV.

Distributions to beneficiaries shall be outright and free of trust, subject to the Distribution to Young Persons provisions at Paragraph C. of Article V.

C. <u>Distribution of Undistributed Principal</u>. If the beneficiary dies prior to full distribution, the then remaining undistributed principal shall be distributed to the next contingent beneficiary in the order of priority established in subparagraph B. 2. of Article IV.

D. <u>Ultimate Distribution</u>. If at any time before full distribution of the trust estate, Settlor and all her issue are deceased and no other disposition of the property is directed herein, the trust estate or the portion of it then remaining shall thereupon be distributed to those persons who would then be the heirs of Settlor, the identities and the respective shares of the heirs to be determined as though the deaths of those respective persons had then occurred and according to the laws of the State of California in effect at the date of execution of this document relating to the succession of separate property not acquired from a predeceased spouse.

V.

## ADDITIONAL DISTRIBUTION PROVISIONS

A. <u>Interest on Pecuniary Amounts</u>. When a beneficiary is entitled to receive payment of a pecuniary amount or an annuity, the beneficiary shall be entitled to receive interest on delayed distributions to the extent provided by California law. If California law has no provision expressly applicable to trusts, interest shall be paid in accordance with California law applicable to a decedent's estate.

B. <u>Undistributed Income</u>. In any instance in which this document fails to expressly provide for the distribution or accumulation of any trust income, that income shall be accumulated and added to principal.

C. <u>Distributions to Young Persons</u>. If any person otherwise entitled to outright distribution of any property from any trust created by this document, is under the age of 30 at the time the right to distribution vests, the trustee shall not make the distribution, but shall, instead, retain the property that would otherwise be distributed in a separate trust for the benefit of the underage person ("Beneficiary"). The separate trust shall be administered as follows:

3

ACP / Patty Brower 0023

Case: 17-05044   Doc# 109-13   Filed: 07/29/19   Entered: 07/29/19 21:25:52   Page 20 of 20
UB0012554