1  MR. BALCH: I think we've been going
2  about an hour.
3  MR. WEEDN: We can take a break. Off
4  the record.
5  (A recess was taken from 1:40 p.m. to
6  1:46 p.m.)
7  MR. WEEDN: Back on the record.
8  THE WITNESS: The money that Mr. Nobles
9  and Mr. Babcock sent to ultimately went to
10 Chateau Julien, Inc., and was booked as an
11 accounts receivable added to the accounts
12 receivable balance by Coastal Cypress
13 Corporation. And, therefore, the money, even
14 though it was for the benefit of Coastal, went
15 to Chateau Julien, Inc.
16 And Coastal received its benefit out of
17 that payment also, but no one would invest in
18 Chateau Julien, Inc., because it was in such a
19 weak financial condition. However, Coastal
20 would attract investors.
21 BY MR. WEEDN:
22 Q. So to clarify, you took money to be
23 invested in Coastal via Mr. Babcock and Mr. Nobles's
24 payments for Coastal shares and invested it in
25 Chateau Julien instead?

98

1           MR. BALCH:  Misstates testimony.
2      A.     No.  It ultimately went to Chateau
3  Julien, Inc., but it was booked as an accounts
4  receivable for Coastal Cypress to the existing
5  account that Coastal had for past due rent and other
6  rentals that Chateau Julien had with Coastal.
7      Q.     So it was turned into a Coastal account
8  receivable from Chateau Julien, Inc.?
9      A.     Correct.
10     Q.     Where is that reflected?
11     A.     It's reflected in the books and records.
12     Q.     Of what?
13     A.     Of Coastal's general ledger.
14     Q.     Is it reflected -- was this treated as a
15 loan by Coastal to Chateau Julien, Inc.?
16     A.     No.  It was treated as an advance.
17     Q.     An advance on what?
18     A.     Advance to Chateau Julien, Inc.
19            Chateau Julien, Inc., received the
20 proceeds, and Coastal Cypress received the
21 shareholders and equity and a book entry for accounts
22 receivable.
23     Q.     Advance to me suggests a situation where
24 Chateau Julien, Inc. is -- withdrawn.
25            Did Chateau Julien, Inc., ever repay

```
1   that amount to Coastal?
2        A.    No, it did not.  Let me expand upon
3   that.  It -- it went into the account balance.  So
4   whatever the account balance was at the end of the
5   2011 and 2015 -- and I don't know whether it made
6   advances on that accounts receivable account or not.
7   I don't have those records in front of me.
8        Q.    Chateau Julien, Inc. no longer operates,
9   correct?
10       A.    Correct.
11       Q.    When did it cease operations?
12       A.    In early 2015.
13       Q.    And I take it Chateau Julien, Inc.,
14  didn't make any further payments to Coastal after it
15  went out of business, correct?
16       A.    Correct.
17       Q.    And at that time that Chateau Julien,
18  Inc., went out of the business, do you know how much
19  money it owed Coastal?
20       A.    I don't recollect, but it is on the
21  books and records that was previously supplied.
22            MR. WEEDN:  I'm going to hand the
23       witness a document previously marked as
24       Plaintiff's Exhibit 26.  It's a Fremont Bank
25       account joint account for Mr. and Mrs. Brower.
```

1  correct?
2  A. Correct.
3  Q. So by this time, Coastal Cypress had
4  effectively sold all of its operations, correct?
5  A. Correct.
6  MR. WEEDN: I will pass to Mr. Brower a
7  document previously marked as Plaintiff's
8  Exhibit 12. And please let me know once you've
9  had a chance to review it?
10  A. Okay.
11  Q. Backing up, I think you previously
12  testified this, but just to confirm, you have been
13  the president of Coastal Cypress Corporation -- let
14  me back up again. Withdrawn.
15  You were the president of Coastal
16  Cypress Corporation California from inception,
17  correct?
18  A. Correct.
19  Q. And you were also president through the
20  merger with Coastal Delaware?
21  A. Correct.
22  Q. And have you also been the president of
23  Coastal Delaware since its inception?
24  A. Correct.
25  Q. Okay. The second page of this document,

137

```
 1            CERTIFICATE OF REPORTER/NOTARY PUBLIC.
 2
 3            I, Goldy Gold, a Notary Public of the
 4   State of Maryland, do hereby certify that the
 5   within-named witness personally appeared before me at
 6   the time and place herein set out, and after having
 7   been duly sworn by me, according to the law, was
 8   examined by counsel.
 9            I further certify that the examination was
10   recorded stenographically by me and this transcript
11   is a true record of the proceedings.
12            I further certify that I am not of counsel
13   to any of the parties, nor in any way interested in
14   the outcome of this action.
15            As witness my hand and notarial seal this
16   5th day of March, 2019.
17
18            *Goldy Gold*
19            _____
              GOLDY GOLD, RPR
              Notary Public
20
21
22
23
24   My Commission Expires:   April 21, 2024
25
```

145