

In the Matter Of:

MUFG UNION BANK

vs

ROBERT BROWER, et al.

ROBERT BROWER

February 21, 2019

Case No:

CERTIFIED COPY

 1   Q.   Who do you contend are the current
 2   shareholders of Coastal Cypress Corporation Delaware?
 3   A.   Robert Brower, Patricia Brower Trust,
 4   Rich Babcock, Anthony Nobles, and Chualar Canyon
 5   Ranch Supply.
 6   Q.   In terms of the shares owned by the
 7   shareholders, the number specified on this Exhibit 1
 8   for Patricia Brower Trust is 125,000 shares; is that
 9   correct?
10   A.   I believe that is correct.
11   Q.   And is that consistent with your
12   understanding of the Patricia Brower Trust's current
13   ownership of Coastal Cypress Corporation Delaware?
14   A.   Yes.
15   Q.   And to back up, this Exhibit 1 pertains
16   to Coastal Cypress California, correct?
17   A.   Yes.
18   Q.   So is the case that when Coastal Cypress
19   Delaware -- Coastal Cypress Corporation California
20   merged into Coastal Cypress Corporation Delaware, was
21   it just a straight-across exchange of shares?
22        In other words, if Patricia Bower Trust
23   had 125,000 shares of Coastal Cypress Corporation
24   California, shares it simply was exchanged for the
25   same number of Coastal Cypress Corporation Delaware

1  shares?
2     A.   The aggregate, yes.
3     Q.   And was the same true for all other
4  shareholders of Coastal Cypress Corporation
5  California at that time?
6     A.   Correct.
7     Q.   This Exhibit 1 reflects 50,000 shares
8  owned by Richard J. Babcock, correct?
9     A.   Correct.
10    Q.   And is it your contention that he owns
11  the same number of shares in Coastal Delaware?
12    A.   Yes.
13    Q.   This document reflects Anthony Nobles'
14  ownership of 200,000 shares, correct?
15    A.   Correct.
16    Q.   And is it your contention that that is
17  the same number of shares that he currently owns in
18  Coastal Delaware?
19    A.   Correct.
20    Q.   As to Chualar Canyon Ranch Supply, this
21  document reflects that entity owning 355,000 shares
22  of Coastal; is that correct?
23    A.   Yes.
24    Q.   And is it your contention that that
25  entity currently owns the same number of shares of

1  Coastal Delaware?

2     A.    Correct.

3     Q.    And how many shares of Coastal Delaware

4  do you currently own?

5     A.    I don't remember the exact number.

6     Q.    Is it the same number of shares of

7  Coastal California that you owned at the time of the

8  Coastal California-Coastal Delaware merger?

9     A.    Yes.

10    Q.    The date reflected here on the left side

11 of the stockholders' name column, and specifically

12 for Chualar Canyon Ranch Supply, is that date,

13 12-19-1987, consistent with your understanding of

14 when of Chualar Canyon Ranch Supply acquired its

15 shares of Coastal Cypress?

16    A.    I believe it would be, yes.

17    Q.    And as to Anthony Nobles and Richard

18 Babcock, the dates next to their names are

19 January 22nd of 2011.

20          Is that consistent with your

21 understanding of when they acquired their Coastal

22 shares?

23    A.    Yes.

24    Q.    And the date next to Patricia Brower

25 Trust is July 1, 2015.

74

1        Is that consistent with your
2   understanding of when the Trust acquired its shares?
3        A.   Yes.
4        Q.   As to Chualar Canyon Ranch Supply,
5   what's your understanding of the nature of that
6   entity?
7        A.   It's owned by Wilfred Lindley.
8        Q.   And Mr. Lindley also goes by "Butch,"
9   correct?
10       A.   Correct.
11       Q.   And in terms of -- do you have an
12  understanding as to what type of entity it is?  And
13  what I mean by that is whether it's a corporation, a
14  sole proprietorship, a partnership.
15       A.   I don't know.
16       Q.   But your understanding is that it's
17  100 percent owned by Mr. Lindley, correct?
18       A.   I never formed an opinion as to whether
19  it is 100 percent owned or not.
20       Q.   So is it your testimony that you don't
21  know whether he is a 100-percent owner?
22       A.   Correct.
23       Q.   Do you contend that Mr. Lindley or
24  Chualar Canyon Ranch Supply paid some type of
25  consideration in exchange for their Coastal

75

1      Q.    Mr. Brower, let me know when you have
2   had a chance to review the document to familiarize
3   yourself with it.
4      A.    I'm generally familiar with it.
5      Q.    Can you tell me what it is?
6      A.    It's a preferred agreement, stock
7   purchase agreement from Coastal Cypress Corporation
8   California.
9      Q.    Is this the agreement by which
10  Mr. Nobles and Mr. Babcock acquired their shares in
11  Coastal Cypress Corporation?
12     A.    Originally, yes.
13     Q.    What do you mean by "originally"?
14     A.    Well, it was intended to be acquired by
15  this agreement, and ultimately it wasn't.
16     Q.    Was it acquired pursuant to some
17  different agreement, written agreement?
18     A.    Well, Mr. Nobles wanted to pay some of
19  Mr. Babcock's shares.  So on Babcock No. 47, or
20  page 12, this was listed as 240 for Anthony Nobles,
21  and it was supposed to be 200 and Babcock was
22  supposed to be 50.  That was one.
23           I think when this was looked at by our
24  chief financial officer, he wanted to issue common
25  stock instead, and ultimately common stock was

```
 1    issued, and this was largely ignored.
 2         Q.    When you say "this was largely ignored,"
 3    you're talking about the entire agreement?
 4         A.    The entire agreement was largely
 5    ignored.
 6         Q.    So ultimately on page 12, I believe,
 7    you're referring to Schedule A, correct?
 8         A.    Yes.
 9         Q.    And so I believe it's your testimony,
10    and correct me if I'm wrong, that Mr. Nobles
11    ultimately acquired 200,000 shares of Coastal Cypress
12    California common stock?
13         A.    Correct.
14         Q.    And that Mr. Babcock ultimately acquired
15    50,000 shares of Coastal common stock, correct?
16         A.    Correct.
17         Q.    In terms of the total amount, the total
18    number of 250,000 shares, was it still turn out to be
19    a dollar per share?     In other words, Mr. Babcock's
20    shares cost $50,000 and Mr. Nobles' shares cost
21    $200,000?
22         A.    Yes.   As long as the aggregate was 250,
23    it was just how it was WACC'd up.
24         Q.    On page 11 of this exhibit, that's
25    BABC00045?
```

1  A.  Yes.
2  Q.  Is that your signature there, on the top
3  of the page?
4  A.  Yes.
5  Q.  Who drafted this agreement?
6  A.  I believe this agreement came from
7  Mr. Nobles' office or Mr. Babcock's office. I don't
8  remember which one.
9  Q.  Was Coastal Cypress represented by
10  counsel during the negotiation of this agreement?
11  A.  No.
12  Q.  Did you discuss this agreement with any
13  of the existing Coastal shareholders prior to
14  entering into it on behalf of Coastal?
15  A.  I don't believe so.
16  Q.  Did you discuss the issuance of common
17  stock with any other shareholders of Coastal prior to
18  issuing common stock to Mr. Nobles and Mr. Babcock?
19  A.  I still had authorization from the
20  corporation to continue to issue shares up to the
21  max. That was already authorized.
22      MR. WEEDN: Can you read back my
23  question, please.
24      (Whereupon, the referred-to question was
25  read back by the Reporter.)

1     A.    And I should have preceded that with no,
2  because I still had issuance authority on the
3  previous amount of shares to be sold.
4     Q.    Thank you.
5           Who came up with the dollar-per-share
6  price pursuant to which the Coastal stock was issued
7  to Mr. Nobles and Mr. Babcock?
8     A.    I think that's a price that we agreed
9  upon and was a price that had been used before to
10  sell shares.
11    Q.    How was the price determined?  Just
12  based on that having been used before?
13    A.    That was certainly one of the
14  determinations that had been used before, and that
15  was the price that Mr. Babcock and Mr. Nobles were
16  willing to pay to become a shareholder.
17    Q.    Did you attempt to determine the actual
18  value of Coastal Cypress at the time that you agreed
19  on that price with Mr. Nobles and Mr. Babcock?
20    A.    No.
21    Q.    Do you contend that Mr. Nobles actually
22  paid $200,000 for his Coastal shares?
23    A.    No.  He paid 240,000, of which 200 he
24  allocated to himself and 40 he allocated to Rich
25  Babcock.

1    Q.    How were those amounts paid?

2    A.    They were paid by wire.  I believe

3  Mr. Nobles has paid by wire.  Mr. Babcock, I'm not

4  sure.

5    Q.    And for purposes of that question, I was

6  just asking about Mr. Nobles, how he made his

7  payments?

8    A.    Mr. Nobles made payment, I believe, by

9  wire transfer.

10   Q.    At what account?

11   A.    I believe it wound up coming to my

12  personal account.

13   Q.    Was the money that Mr. Nobles paid

14  subsequently transferred to Coastal?

15   A.    Yes.

16   Q.    How?

17   A.    A book entry was made on Coastal's

18  account for the $240,000 in the stock account.  And

19  originally it was recorded as preferred stock, in the

20  preferred stock account.  That was set up as

21  classification.

22   Q.    You said a book entry was made.  What do

23  you mean by that?

24   A.    Coastal Cypress recorded the fact that

25  it received $240,000 in equity from a shareholder.

1   Q.   And that was in its accounting records,
2   correct?
3   A.   In its accounting records, correct.
4   Q.   And you were the one responsible for
5   maintaining those accounting records?
6   A.   No, that was Anthony Galluci.
7   Q.   So Mr. Galluci made that entry into the
8   accounting record?
9   A.   Correct.
10   Q.   My question was a little bit different,
11   though.
12       Did Coastal Cypress Corporation ever
13   actually receive the $240,000 paid by Mr. Nobles?
14   A.   I don't know what portion it received.
15   I believe it received the entire amount at some
16   particular time, but I don't recall when.
17   Q.   What's your basis for that belief?
18   A.   General belief.
19   Q.   At the time of this transaction in 2011,
20   Coastal Cypress had its separate bank account with
21   Fremont Bank, correct?
22   A.   Correct.
23   Q.   So if the Coastal Cypress had actually
24   received the $240,000 that Mr. Nobles paid to your
25   personal bank account, its receipt of that money

92

1  would have been reflected in the Fremont Bank
2  records, correct?
3      A.   Like I said, the $240,000 was wired to
4  my personal account.
5          MR. WEEDN:  Can you reread my question.
6          (Whereupon, the referred-to question was
7      read back by the Reporter.)
8      A.   Not necessarily.
9      Q.   Why not?
10     A.   Because you can make a book entry.  If
11 Coastal owed me $240,000 and I got $240,000 from
12 somebody else to buy shares, it could have just been
13 a simple book entry of, okay, you keep the 240 that
14 you got from over here; however, give him the 240,000
15 shares over here.
16         So it doesn't necessarily have to come
17 through the bank in order to be a valid accounting
18 transaction.
19     Q.   How else would it come into Coastal if
20 not through its bank account?
21     A.   It doesn't need to come into Coastal,
22 necessarily.  Like I said, there are a lot of
23 factors.  As long as the books and records of the
24 company are correct, and they were, and it was posted
25 as a stock purchase, and it was, and who owed whom

1  what at that particular time and how those amounts
2  were paid off are really irrelevant to the
3  transaction.
4         Mr. Nobles bought shares and he received
5  shares, and that was -- that was it.  He was issued
6  his shares.  That was evidence that we received his
7  payment and he's fine.
8     Q.   So is it your position that Coastal
9  could issue shares for $240,000 and never actually
10  receive that money?
11         MR. BALCH:  Objection.  Misstates his
12     testimony.  Calls for expert testimony.
13         You can answer.
14     A.   Repeat the question?
15         (Whereupon, the referred-to question was
16     read back by the Reporter.)
17         MR. BALCH:  Same objection.  You can
18     answer.
19     A.   Yes.
20     Q.   In terms of the money that Mr. Babcock
21  paid for Coastal shares, my understanding is that you
22  contend that Mr. Nobles paid $40,000 for 40,000 of
23  Mr. Babcock's shares, correct?
24     A.   Correct.
25     Q.   And that Mr. Babcock paid the remaining

94

1  the $10,000.

2      Q.    Any other basis for that belief?

3            MR. BALCH:  I'll object.  The document

4  speaks for itself.

5            You can answer.

6      A.    The issuance of the shares.  He was

7  issued his shares based on the fact that money was

8  all paid and received.

9      Q.    Are you aware of any other documents

10 that reflect Coastal's receipt of $10,000 from

11 Mr. Babcock for his Coastal shares?

12     A.    I'm not in possession, so I'm not aware.

13     Q.    Do you know when the transfer took

14 place?

15     A.    The transfer?

16     Q.    Mr. Babcock's payments of $10,000 to

17 Coastal.

18     A.    Sometime during 2011.

19     Q.    And what do you base that on?

20     A.    The books and records of the company

21 were correct at the end of December 2011, reflecting

22 $250,000 for preferred shares that were issued.

23     Q.    Which books and records are you

24 referring to?

25     A.    Coastal Cypress Corporation's general

1     MR. BALCH:  I think we've been going
2  about an hour.
3     MR. WEEDN:  We can take a break.  Off
4  the record.
5     (A recess was taken from 1:40 p.m. to
6  1:46 p.m.)
7     MR. WEEDN:  Back on the record.
8     THE WITNESS:  The money that Mr. Nobles
9  and Mr. Babcock sent to ultimately went to
10  Chateau Julien, Inc., and was booked as an
11  accounts receivable added to the accounts
12  receivable balance by Coastal Cypress
13  Corporation.  And, therefore, the money, even
14  though it was for the benefit of Coastal, went
15  to Chateau Julien, Inc.
16     And Coastal received its benefit out of
17  that payment also, but no one would invest in
18  Chateau Julien, Inc., because it was in such a
19  weak financial condition.  However, Coastal
20  would attract investors.
21  BY MR. WEEDN:
22  Q.    So to clarify, you took money to be
23  invested in Coastal via Mr. Babcock and Mr. Nobles's
24  payments for Coastal shares and invested it in
25  Chateau Julien instead?

98

1          MR. BALCH:  Misstates testimony.

2      A.    No.  It ultimately went to Chateau
3  Julien, Inc., but it was booked as an accounts
4  receivable for Coastal Cypress to the existing
5  account that Coastal had for past due rent and other
6  rentals that Chateau Julien had with Coastal.

7      Q.    So it was turned into a Coastal account
8  receivable from Chateau Julien, Inc.?

9      A.    Correct.

10     Q.    Where is that reflected?

11     A.    It's reflected in the books and records.

12     Q.    Of what?

13     A.    Of Coastal's general ledger.

14     Q.    Is it reflected -- was this treated as a
15  loan by Coastal to Chateau Julien, Inc.?

16     A.    No.  It was treated as an advance.

17     Q.    An advance on what?

18     A.    Advance to Chateau Julien, Inc.
19           Chateau Julien, Inc., received the
20  proceeds, and Coastal Cypress received the
21  shareholders and equity and a book entry for accounts
22  receivable.

23     Q.    Advance to me suggests a situation where
24  Chateau Julien, Inc. is -- withdrawn.

25           Did Chateau Julien, Inc., ever repay

1       CERTIFICATE OF REPORTER/NOTARY PUBLIC.

2

3          I, Goldy Gold, a Notary Public of the

4   State of Maryland, do hereby certify that the

5   within-named witness personally appeared before me at

6   the time and place herein set out, and after having

7   been duly sworn by me, according to the law, was

8   examined by counsel.

9          I further certify that the examination was

10  recorded stenographically by me and this transcript

11  is a true record of the proceedings.

12         I further certify that I am not of counsel

13  to any of the parties, nor in any way interested in

14  the outcome of this action.

15         As witness my hand and notarial seal this

16  5th day of March, 2019.

17

18  _____
               *Goldy Gold*

19        GOLDY GOLD, RPR
          Notary Public

20

21

22

23

24  My Commission Expires:  April 21, 2024

25

145